NOTICE

Decision filed 04/08/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250873-U

NO. 5-25-0873

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| ZACHARY C. ERVIN, | ) | Montgomery County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 24-DC-1 |
| | ) | |
| MEGAN M. ERVIN, | ) | Honorable |
| | ) | Nathan A. Frisch, |
| Respondent-Appellant. | ) | Judge, presiding. |

_____

JUSTICE SHOLAR delivered the judgment of the court.
Justices Vaughan and Hackett concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court's order granting step-parent visitation and awarding parenting time was not against the manifest weight of the evidence. The judgment of the circuit court is affirmed.

¶ 2    Respondent, Megan M. Ervin, appeals from the order of the Montgomery County circuit court, which, *inter alia*, granted step-parent visitation to petitioner, Zachary E. Ervin, and established parenting time and responsibilities between the parties. On appeal, she challenges the circuit court's granting of step-parent visitation to Zachary, the allocation of parenting time, and

1

the circuit court's consideration of evidence presented at the hearing. For the reasons we explain below, we affirm the judgment of the circuit court.[1]

¶ 3                                    I. BACKGROUND

¶ 4                              A. Petition and Proceedings

¶ 5    The parties were married on June 27, 2014, and share one minor child, L.E., born October 2016. Megan has two other children from previous relationships, A.U., aged 16,[2] and J.E., born March 2014. Zachary filed a petition for dissolution of marriage on January 2, 2024, stating irreconcilable differences caused the breakdown of the marriage. Zachary stated that J.E. was born prior to the parties' marriage and that he was not the biological father of J.E., but the child received his last name and only knew Zachary as his father. Zachary filed a petition for temporary relief the same day, requesting joint parental responsibility and equal parenting time with the children, L.E. and J.E., and equitable distribution of property. Megan filed her response to the petitions on March 21, 2024. Megan requested sole decision making and majority parenting time for L.E., and asked the circuit court to deny Zachary's request for step-parent visitation of J.E. because Zachary was not the biological father of J.E. and did not have standing.

¶ 6    On May 28, 2024, Megan filed a petition for temporary relief. The petition alleged that the parties "attempted an equal split of parenting time" but due to Zachary's work schedule and working overnight, he was unable to take care of the children. The petition requested Megan be awarded majority parenting time and decision making for L.E., that Zachary receive no or limited

---

[1]This cause involves an accelerated appeal under Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). Under Rule 311(a)(5), the appellate court is required to issue a decision within 150 days after the filing of a notice of appeal, except for good cause shown. Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). Our decision in this case was due on or before March 23, 2026. However, the appellant requested multiple extensions of time to file her initial brief, totaling 46 days. We find that good cause exists to issue our disposition outside the 150-day deadline.
[2]A.U.'s exact birth date is not included in the record.

time with J.E. and no decision making for him, and that temporary child support for L.E. should be issued.

¶ 7     On May 29, 2024, Zachary filed an emergency petition for temporary relief. The petition stated that after the parties separated in December 2023 Zachary moved out of the marital residence and began living with his mother. Since the separation, the parties operated under a verbal agreement for equal parenting time, alternating one week at a time. On May 26, 2024, Megan informed Zachary that she was "invoking her parental rights" and Zachary was no longer allowed to see or speak to J.E. Additionally, Megan informed J.E. that Zachary was not his biological father. Megan changed J.E.'s phone number and did not provide it to Zachary. Before J.E.'s number was changed, Zachary communicated with J.E. via text messaging every day, but Zachary had not received any communication from J.E. since the change. Megan also told Zachary his parenting time with L.E. would be restricted to days when he was not working, and that the children told her they did not want to see Zachary. The petition further stated that Megan "made an unreasonable denial of visitation" between Zachary and J.E., Zachary was the only father J.E. has ever known, and the "abrupt termination of their relationship and contact creates undue mental and emotional harm to the minor child." Zachary stated that he had standing to request step-parent visitation, and the claims were brought pursuant to section 602.9 of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/602.9 (West 2022)). Zachary requested that the parties follow the temporary parenting time order, that he be allowed to contact J.E., and to have joint parental responsibility of L.E. until a further hearing was held.

¶ 8     The circuit court held a hearing on all pending motions on June 7, 2024. The court granted Zachary parenting time with both children on alternating weekends, and every Tuesday and Thursday evening from 4:00 p.m. to 8:00 p.m. Zachary was to be present during his time and not

3

use substitute care. Megan was ordered to provide J.E.'s phone number to Zachary. Keith Jacob was appointed as the guardian *ad item* (GAL). The court entered a written temporary order of its findings on June 11, 2024.

¶ 9 On July 30, 2024, Zachary filed a petition for indirect civil contempt. The petition alleged that after the temporary court order that outlined the parenting time granted by the court, Megan did not follow the order. Specifically, on July 25 and 30, 2024, Megan informed Zachary that J.E. "would not be attending" Zachary's parenting time. Megan did not respond when Zachary requested information as to the reason for J.E. not attending. Zachary asked the court to find Megan in indirect civil contempt for failing to abide by the temporary court order, and requested that an order be entered requiring Megan to follow the parenting time order and provide make up time.

¶ 10 Zachary filed a petition for temporary restraining order (TRO) and/or preliminary injunction on August 12, 2024. The petition stated that L.E. previously attended the Hillsboro School District, but Zachary discovered that L.E. was not enrolled for the 2024-2025 school year despite the marital home being in the district. Megan and her counsel did not respond to requests for information about where Megan intended to enroll L.E. in the upcoming school year. Zachary discovered that L.E. had been enrolled in the Mt. Olive School District, but Megan did not reside in said district. Additionally, the parties had equal decision making in all areas, including education. Zachary requested that L.E. be enrolled at the Hillsboro School District until a further hearing was conducted. The circuit court held a hearing on August 13, 2024, and denied the TRO. The court instructed Zachary to file a petition for temporary relief.

¶ 11 Zachary filed the petition for temporary relief on August 19, 2024, which included the same information as the TRO as to L.E.'s school district. Additionally, the petition stated that Megan does not work in Mt. Olive and her only connection to the town was her boyfriend's family.

4

The petition alleged that on August 13, 2024, Megan refused to allow Zachary his parenting time of L.E. claiming it was not in L.E.'s "best interest." Zachary also had not seen J.E. since July 25, 2024, despite the court order.

¶ 12    Zachary filed a petition for indirect civil contempt on September 13, 2024. The petition stated that in addition to August 13, 2024, Megan did not follow the court order for parenting time on September 12, 2024, claiming it was L.E.'s choice not to attend.

¶ 13    The hearing for Zachary's first petition for indirect civil contempt began on August 27, 2024, but had to be continued due to time constraints. The hearing was ultimately continued, on Megan's motion, to October 29, 2024. During the hearing, the parties and court discussed step-parent visitation, and Megan's counsel argued that Zachary never filed for step-parent visitation and would not have standing to do so. Zachary's counsel stated that the motion for temporary relief was filed pursuant to the pertinent statute (750 ILCS 5/602.9 (West 2022)), but counsel would file an amended petition clearly including the statutory language. The circuit court stated it would permit counsel to amend the petition for dissolution, and informed Megan's counsel that if she intended to challenge Zachary's standing for step-parent visitation, she needed to file an affirmative defense as to standing. The parties agreed to adjust the temporary parenting order to remove the weeknight visits for L.E., but the weekend overnight visits remained. The hearing on the petition for indirect civil contempt was again continued at the request of Megan.

¶ 14    On October 29, 2024, Zachary filed an amended petition for dissolution of marriage. The petition included the same information as to irreconcilable differences and the children's parentage. It additionally stated that Megan intentionally frustrated Zachary's ability to exercise parenting time and decision making for L.E., requesting sole parental responsibility and primary parenting time of her. As to J.E., the petition stated that Zachary was his step-father and the

5

unreasonable denial of visitation with him by Megan created undue mental and emotional harm to J.E. The petition stated that pursuant to section 602.9(c)(1)(E) of the Marriage Act (750 ILCS 5/602.9(c)(1)(E) (West 2022)), Zachary had standing to request step-parent visitation of J.E. *Id*. § 602.9.

¶ 15    On November 4, 2024, the circuit court continued the August 27, 2024, hearing on the petition for indirect civil contempt. Megan testified as to her refusal to follow the court order and her reasons why, including that J.E. did not want to see Zachary and that Megan did not believe the visitation to be in J.E.'s best interest. The circuit court took the matter under advisement.

¶ 16    The GAL filed an interim report on November 12, 2024. The report included the interviews and conversations the GAL had with the parties and the children. The report included that J.E. informed the GAL that he preferred the Hillsboro School District, and he did not know that he was moving schools until a day or two before. J.E. also told the GAL that one day, Megan walked into J.E.'s bedroom and abruptly told him that Zachary was not his father. J.E. told the GAL that he knew Zachary was not his real father, but still wished to see Zachary. The GAL expressed concerns over Megan not following the court order and denying Zachary visitation with J.E. The report further stated that the GAL believed it to be "extremely detrimental to a child to at the onset of a custody battle inform a child that has believed someone to be their father their entire lives that [Zachary] is in fact not their father only to remove the child from their father's life completely."

¶ 17    The GAL spoke with L.E. and she informed him that she liked both schools the same, and that Zachary's house was "bug infested." L.E. then stated she enjoyed going to Zachary's house because there were fun things to do. The GAL noted that it appeared Megan spoke to L.E. about what to say to the GAL because L.E. reported bugs in the home, then stated she enjoyed it. When the GAL went to Megan's home to complete a walk through, Megan informed the GAL that L.E.

6

wanted to speak with him again. The GAL noted that this was not typical of a seven-year-old girl to request, but he spoke with her anyway. L.E. said that Zachary throws things and said a bad word about Megan, that she was tired of getting spider bites from Zachary's home (she previously had one spider bite that was documented weeks prior), and that she gets eye infections from Zachary's house. L.E. told the GAL that Megan told her all of this. The GAL reported that he had a "very strong opinion" that Megan was talking with L.E. about what to tell him and influencing her.

¶ 18 For J.E., the GAL recommended "ample visitation" with Zachary and that it was in J.E.'s best interest to have visits with Zachary. For L.E., the GAL recommended shared decision making for the parties. The GAL recommended L.E. attend Mt. Olive School District due to the complications with J.E. and ensuring the children resided together during this "extremely difficult stage in their lives." The GAL recommended alternating holidays, and that during the summer, the parties equally split the summer months with one week on, one week off. During the school year, the GAL recommended that Megan have majority parenting time due to the school location, with Zachary receiving Thursday from 4:00 p.m. to Monday at 8:00 a.m., as well as Tuesday evenings.

¶ 19 Megan filed a response to the amended petition for dissolution on December 20, 2024. In this response, Megan stated an objection to Zachary stating that J.E. was not his biological child, but he took Zachary's last name and only knew him as a father. The objection stated, "750 ILCS 5/ does not apply to any child not biologically related to parties or lawfully adopted by the parties." Megan also objected to the claim that Zachary was the step-father of J.E., stating, "irrelevant to this cause of action." Megan denied the claim that Zachary had standing to request step-parent visitation pursuant to section 602.9(c)(1)(E) of the Marriage Act.

¶ 20 The trial on the dissolution petition was held on December 20, 2024, April 1, 2025, April 2, 2025, and April 3, 2025. The parties do not argue any errors as to the procedure of the dissolution

7

trial, but rather only the circuit court's application of the law to the testimony and evidence presented. In the interest of brevity, the facts the circuit court relied upon in its written order will be discussed below.

¶ 21 The GAL filed his final report on April 8, 2025. The report considered each factor for L.E.'s best interest. The GAL asserted that it would be in L.E.'s best interest for Zachary to be awarded the majority parenting time during the school year, and for L.E. to attend Hillsboro School District. Megan should receive alternate weekends overnight and two evenings a week of parenting time. The parties should split parenting time equally in the summer and share in decision making. The GAL recommended substantial visitation for J.E. with Zachary, and the visitation schedule should follow L.E.'s so the siblings would be with each other during visits.

¶ 22 Zachary filed his closing argument on April 24, 2025. The closing argument included the case procedural history, all relevant legal authorities, and applied the facts of the case to each element of parental responsibilities, parenting time, step-parent visitation, and financial matters. Megan filed her closing argument on May 30, 2025. The closing argument included an application of the hearing testimony to the best interests of L.E., a review of financial matters, and argument over step-parent visitation for J.E.

¶ 23                                   B. Circuit Court's Findings

¶ 24 The circuit court entered a single spaced, 31-page order. The order very clearly addressed all the issues presented before it, and it will be summarized here.

¶ 25 After providing the general facts of the case and all pertinent statutes, the circuit court first addressed the parties' credibility from the dissolution trial. The circuit court stated, "The Court finds [Zachary]'s testimony mostly credible. *** [Zachary]'s answers to questions posed to him reflected his general demeanor during trial; [Zachary] was telling the truth." The court specifically

8

included testimony from Zachary about acting as J.E.'s father, even though he was not his biological father, parenting involvement with L.E., and his financial situation. As to Megan, "The Court finds [Megan]'s testimony not credible." The court stated that Megan's testimony about her move to Mt. Olive, employment, financial situation, and parenting decisions for J.E. and L.E. was not credible. Specifically, Megan gave several different reasons as to why she stopped visitation between J.E. and Zachary, and provided no credible reason as to why she denied parenting time for L.E. in May of 2024. The Court also found the GAL's testimony to be credible, stating, "Despite [Megan]'s arguments to the contrary, the GAL did not show any bias against either party and answered questions directly and honestly."

¶ 26    The circuit court next considered the allocation of parental responsibilities, pursuant to section 602.5(c) of the Marriage Act (750 ILCS 5/602.5(c) (West 2022)). The circuit court listed each factor and whether it favored either party. Of the 15 factors, the court found that 2 factors did not apply and 8 factors did not favor either party.

¶ 27    The court found the following factors favored Zachary. First, the ability of the parents to cooperate to make decisions, or the level of conflict between the parties that may affect their ability to share decision making favored Zachary. The circuit court noted "[Megan]'s unwillingness to include [Zachary] in decisions that need to be made for L.E. It is this Court's opinion that [Megan] believes [Zachary] is not an equal parent." Next, the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child favored Zachary. The circuit court found that Megan showed multiple instances of not facilitating a relationship between L.E. and Zachary, specifically not allowing L.E. to see Zachary on Father's Day because it was not on the parenting time schedule, making unfounded allegations to the Illinois Department of Children and Family Services (DCFS), denying parenting time with L.E. to

9

Zachary, Megan's intention to prohibit Zachary from any extended parenting time in the summer, attempting to obtain an emergency and plenary order of protection against Zachary, and coaching L.E. to say negative things about Zachary to the GAL. Finally, as to any other factor that the court expressly finds to be relevant, the court found "[Megan]'s pattern of behavior towards [Zachary] expressly relevant." The court stated that the parties had been married for 10 years and they shared parenting responsibilities together, but six months after their separation, "[Megan] has decided that she controls L.E.'s life and [Zachary]'s involvement in L.E.'s life." Megan additionally showed the court she would violate a court order to deny Zachary parenting time and moved L.E. to a new school without informing Zachary. Megan previously told the court that she "was concerned" that Zachary used family members and babysitters to help care for L.E. while he worked night shift, but now she would utilize the same help when she worked night shift. As to Megan's coaching of L.E. to speak to the GAL, the court said, "Using a 7-year-old child to get the child to speak negatively of the child's own father is further evidence to this Court that [Megan] will do anything to minimize [Zachary]'s role as L.E.'s father."

¶ 28    The circuit court found one factor in favor of Megan: the level of each parent's participation in past significant decision-making with respect to the child. This was due to Megan's nursing background and making medical decisions for L.E.

¶ 29    The circuit court, considering the factors listed, testimony and arguments of the parties, and the GAL recommendation, found that the parties would equally share all significant decision-making responsibilities. This included education, health, extracurricular activities, and religion.

¶ 30    The circuit court then addressed the allocation of parenting time to the parties according to the best interests of the child, pursuant to section 602.7(b) of the Marriage Act (*id*. § 602.7(b)). Of

10

the 17 factors included in the order, the court found that 5 factors did not apply, and 4 did not favor either party.

¶ 31    The court found six factors favored Zachary. First, the wishes of the child favored Zachary because L.E. previously expressed a desire to have equal parenting time, but changed what she told the GAL after Megan coached L.E. to say negative things about Zachary and his residence. The court said, "L.E. is being harmed by [Megan]'s manipulation." Second, the child's adjustment to her home, school, or community favored Zachary. The circuit court noted that L.E. expressed to the GAL that she missed her friends at Hillsboro and preferred Hillsboro over Mt. Olive. Next, the child's needs favored Zachary. The circuit court found that "L.E. needs a parent who will put her best interests first and not parents who try to 'game' the court system to benefit the parent." Further, "[Megan] has consistently displayed a 'do as I say, not as I do' attitude towards [Zachary]'s parenting time." Also, the willingness and ability of each parent to place the needs of the child ahead of his or her own needs favored Zachary. The circuit court noted that Zachary quit his employment with a coal mine so he could exercise parenting time with L.E., and he moved into a new residence to utilize his parenting time and ease any concerns about L.E.'s safety after the spider bite. Megan, however, decided to move to Mt. Olive and this decision did not appear to the court to be "made with L.E.'s best interests in mind or placing L.E.'s needs above her own." Megan did not have any connection to Mt. Olive other than her boyfriend's parents living there. Megan worked about an hour away from Mt. Olive. The court said that Megan's coaching of L.E. when speaking with the GAL did not put her needs above Megan's, and, "No child should be manipulated by a parent for any reason, but certainly not for the sake of trying to either gain parenting time, or as in this case, for the sake of trying to prohibit parenting time of the other parent." The court further found "that [Megan] wants to control [Zachary]'s involvement with L.E.

11

and has set the needs of L.E. aside to accomplish her goal." Further, the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child favored Zachary. Megan argued that "she only refused parenting time to [Zachary] 3 times," but the court said that the court order was not a suggestion and was to be followed. Finally, any other factor that the court expressly finds to be relevant favored Zachary. The court found that Megan had shown a pattern of attempting to minimize Zachary's role in L.E.'s life, "yet [Megan] did not present any evidence that [Zachary]" was a bad parent. The court said that it found "[Megan]'s behavior expressly relevant because absent court intervention, [Megan] will continue to force [Zachary] out of L.E.'s life and there simply has not been a single fact presented that supports [Megan]'s position towards the father of her child."

¶ 32    The court found two factors favored Megan. First, any prior agreement or course of conduct between the parties related to caretaking functions with respect to the child favored Megan. The court noted that pursuant to the temporary relief order, Megan had been the primary caretaking parent of L.E. since May 2024. Second, the interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interest favored Megan. The circuit court found that because of L.E.'s relationship with J.E. and A.U. and residing with them, maintaining their relationship was important.

¶ 33    The circuit court, considering the factors listed, testimony and arguments of the parties, and the GAL recommendation, found that it was in the best interest of L.E. for her to primarily reside with Zachary and attend the Hillsboro School District. Megan was granted parenting time every other weekend overnight, every Thursday evening, and Tuesday evenings when Megan does not have a weekend overnight scheduled. The parties would share parenting time equally over the summer.

12

¶ 34 The circuit court said that this was not an easy decision to make due to separating the siblings, but believed it to be in the best interests of L.E. so that she may maintain a relationship with Zachary. This decision was in part based upon Megan's actions to minimize Zachary's role in L.E.'s life and Megan's willingness to violate court orders. The circuit court also considered child support, dissipation of marital assets, imputing income, award of checking account balance, and retroactive child support. As these issues are not argued on appeal, we will not address them here.

¶ 35 The circuit court next addressed step-parent visitation, pursuant to section 602.9 of the Marriage Act. *Id*. § 602.9. The court first discussed the standing requirement under the statute. In his amended petition for dissolution of marriage, Zachary alleged that he was J.E.'s stepfather, Megan had made an unreasonable denial of visitation between Zachary and J.E., and that the abrupt termination of their relationship and contact creates undue mental and emotional harm to J.E. The court stated that Megan did not file a motion to dismiss for lack of standing and did not plead an affirmative defense challenging Zachary's request for step-parent visitation. Megan argued that because the parties dissolved their marriage, Zachary was not a step-parent. The court stated, "Here, [Megan] did not satisfy her burden of pleading and proving the affirmative defense of lack of standing; rather, [Megan] simply denied or objected to [Zachary]'s allegations as irrelevant in her response and also argued lack of standing in her closing argument." The court analyzed Zachary's standing notwithstanding Megan's procedural deficiencies.

¶ 36 The circuit court found that section 602.9(c)(1)(E) of the Marriage Act applies to individuals in Zachary's position, "a step-parent who is divorcing the child's parent." *Id*. § 602.9(c)(1)(E). Standing was determined at the time the cause of action was filed, and as

such, "[Megan] [had] forfeited her argument as to standing by failing to timely plead and prove lack of standing as an affirmative defense."

¶ 37    Section 602.9(b)(4) of the Marriage Act (*id*. § 602.9(b)(4)) provides a rebuttable presumption that Megan's actions and decision regarding step-parent visitation were not harmful to J.E.'s mental, physical, or emotional health. Zachary thus had the burden to prove that Megan's actions and decisions were in fact harmful to J.E.

¶ 38    Zachary argued to the court that J.E. wanted to see Zachary, and the GAL testified to this fact. Further, Zachary provided a letter from J.E. as Exhibit 43. The exhibit, which was introduced at the hearing without objection, was a handwritten note from J.E. to Zachary. The court included a photo of the exhibit in its order. The letter was written by J.E. on December 31, 2024, five months after J.E. had last seen Zachary. The letter, addressed to "Dad," included that J.E. missed Zachary "soo [*sic*] much," that Zachary was his best friend forever, and that J.E. loved Zachary "best and most and best." The court stated,

> "[Zachary]'s Exhibit 43 shows that even 5 months after not seeing [Zachary], J.E. was still being emotionally and mentally harmed by [Megan]'s unreasonable denial of visitation with [Zachary]. At the time of writing the letter, J.E. knew [Zachary] was not his real father as well. J.E. took steps to hide the letter from [Megan] and to have L.E. deliver it to [Zachary]."

The court also considered that Megan told J.E. that Zachary was not his biological father during the proceedings, and that both children were enrolled in counseling to deal "with the children's emotional and mental harm caused by [Megan]'s unreasonable denial of visitation."

¶ 39    The court then evaluated the nine factors under section 602.9(b)(5) and three factors under section 602.9(c)(2) of the Marriage Act (*id* §§ 602.9(b)(5), (c)(2)), finding all 12 to be in favor of

permitting visitation with Zachary. The court granted Zachary step-parent visitation with J.E. and that it was "in the best interest of both L.E. and J.E. to spend as much time together as possible given the Court's award of primary parenting time of L.E. to [Zachary]." Zachary received visitation for one weekend per month to occur at the same time that L.E. was with Zachary. The court filed the "Amended Parenting Plan and Step[-]parent Visitation Order" on October 16, 2025,[3] detailing the findings above, as well as the dissolution of marriage order. Megan timely appealed.

¶ 40                                  II. ANALYSIS

¶ 41     On appeal, Megan argues that (1) the circuit court erred by depriving Megan of her constitutional rights, (2) the court erred in awarding "parenting time" of J.E. to Zachary, (3) the court failed to properly apply the step-parent statute, (4) the court improperly relied upon the GAL reports, as the GAL held bias against Megan, and (5) the parenting plan was not in the best interests of L.E. For the following reasons, we affirm.

¶ 42                          A. Constitutional Rights

¶ 43     Megan first argues that the circuit court violated her 14th amendment constitutional rights. The argument in Megan's brief, in its entirety, is as follows:

> "J.E. is [Megan]'s son. [Zachary] is not J.E.'s parent. The presumption is the 'embodiment of the fundamental right of parents to make decisions concerning the care, custody, and control of their children which is protected by the fourteenth amendment.' *Flynn v. Henke*l [*sic*], 227 Ill. 2d 176, 181, 316 Ill.Dec 688, 880 N.E.2d 166 (2007)."

Megan's brief then addresses her second issue on appeal.

---

[3]The original parenting plan order was entered on October 14, 2025, but amended to correct a typographical error as to a date pertaining to child support.

15

¶ 44    Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) requires the argument section of an appellant's brief to "contain the contentions of the appellant and the reasons therefor, with citation of the authorities *** relied on." As a reviewing court, we are "entitled to have the issues clearly defined and supported by pertinent authority and cohesive arguments; [we are] not merely a repository into which an appellant may 'dump the burden of argument and research,' nor is it the obligation of this court to act as an advocate or seek error in the record." *U.S. Bank v. Lindsey*, 397 Ill. App. 3d 437, 459 (2009) (quoting *Obert v. Saville*, 253 Ill. App. 3d 677, 682 (1993), and citing Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008)). Additionally, we will not "research the issues on the appellant's behalf." *Gakuba v. Kurtz*, 2015 IL App (2d) 140252, ¶ 19.

¶ 45    "An issue not clearly defined and sufficiently presented fails to satisfy the requirements of [Rule 341(h)(7)]." *Cwik v. Giannoulias*, 237 Ill. 2d 409, 423 (2010). Where an appellant fails to sufficiently present an argument in his opening brief, the argument is "forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 46    Megan includes one citation of a general standard applicable in cases involving parental rights, but does not include any case law that would apply the cited standard to the case at hand. She presents no argument as to how the trial court violated her constitutional rights. Megan does not even include a citation to the 14th amendment itself. The argument does not cite any case law or authority to show why this alleged error amounts to a violation of her constitutional right. By failing to cite case law or legal authority for her argument that the circuit court deprived her of her constitutional rights, Megan has forfeited her argument.

¶ 47                              B. "Parenting Time" of J.E.

¶ 48    Megan argues that the circuit court erred in awarding "parenting time" of J.E. to Zachary when Zachary is not J.E.'s parent. Megan provides a statutory interpretation argument for the Marriage Act regarding parenting time and step-parent visitation, asking this court to conduct a *de novo* review of the statute. Megan cites to section 600 of the Marriage Act (750 ILCS 5/600(e), (f) (West 2024)) and includes definitions of "parenting time" and "parenting plan.".

¶ 49    Megan's argument under this section fails to apply the cited case law about statutory interpretation to Zachary or J.E. in any way. Her argument instead focuses on the granting of parenting time of L.E., her best interests, and the GAL's recommendation. Under the section of her brief regarding step-parent visitation, Megan again argues that Zachary received "parenting time" under the statute.

¶ 50    Megan is referring to the order titled, "Amended Parenting Plan and Step[-]parent Visitation Order," entered by the court on October 16, 2025, with a *nunc pro tunc* date of September 24, 2025, which was the date of the circuit court's written order detailing its findings. The September order clearly grants step-parent visitation to Zachary for J.E., pursuant to section 602.9(b)(5) of the Marriage Act. *Id*. § 602.9(b)(5)). The order found:

> "The Court has reviewed the statutory factors set forth in 750 ILCS 5/602.9 *et seq.*, considered the evidence received at trial, considered the GAL's recommendation, considered the arguments of the parties, and researched the issue of step-parent visitation. As a result of the foregoing, the Court finds the statutory factors and evidence favor step-parent visitation and grants [Zachary] step-parent visitation with J.E."

Megan argues that the October order, prepared by Zachary's counsel, finds that "Parenting Time" pursuant to section 602.10 of the Marriage Act was awarded to Zachary for J.E. *Id*. § 602.10.

17

¶ 51     Megan's notice of appeal only includes the October order. However, an order that is not specified in the notice of appeal is reviewable if it is a step in the procedural progression leading to the judgment specified in the notice of appeal. *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 23. As such, we may consider the circuit court's September order in our review.

¶ 52     The October order is formatted with all "parenting time" under a single subheading and summarizes the schedule set forth by the court in its September order for both children. For J.E., the time granted is exactly what was stated by the court in its September order for step-parent visitation, pursuant to section 602.9 of the Marriage Act (*id*. § 602.9 (West 2024)). The title of the order states "Step[-]parent Visitation Order" in its heading before describing the schedule set forth by the circuit court in September. The October order, viewed in conjunction with the September order, clearly references the granted step-parent visitation of J.E. to Zachary. The October order itself even has an effective date from when the circuit court entered its September order. As such, the October order is not granting "parenting time" as argued by Megan but instead is creating a clear schedule for the parties regarding parenting time of L.E. and visitation of J.E.

¶ 53                    C. Application of Section 602.9 of the Marriage Act

¶ 54                        1. *Contents and Form of Petition*

¶ 55     Megan argues that the circuit court failed to properly apply section 602.9 of the Marriage Act. *Id*. She first asserts, "[Zachary] failed to file a petition for step-parent visitation." This claim is rebutted by the record. On October 29, 2024, Zachary filed an amended petition for dissolution of marriage. The petition included the following language:

> "12. [Zachary] is the stepfather of [J.E.]
> 13. [Zachary] is the only father [J.E.] has ever known and has been in a relationship with [Megan] since prior to the child's birth.
> 14. [Zachary] and [J.E.] had an extraordinary close relationship prior to the separation.

18

15. [Megan] has made an unreasonable denial of visitation between [Zachary] and [J.E.]

16. Said abrupt termination of their relationship and contact creates undue mental and emotional harm to the minor child.

17. [J.E.] desires to have visitation with [Zachary].

18. [Megan] moved [J.E.] out of his school district and home.

19. [Zachary] has standing to request step-parent visitation as the parents of [J.E.] are not married, not living together and the parent-child relationship has been established between [Megan] and [J.E.] pursuant to 750 ILCS 5/602.9(c)(1)(E)."

¶ 56 Megan in fact even acknowledges this pleading, stating that Zachary "filed an Amended Petition for Dissolution claiming he had 'standing' for step-parent visitation pursuant to 750 ILCS 5/602.9 and sought the same in his plea for relief." Megan, however, then states, "[Zachary] did not file a petition under 750 ILCS 5/602.9."

¶ 57 Megan fails in her brief to provide any case law or explanation as to why this pleading is insufficient to petition the court for step-parent visitation. Within her reply brief, Megan argues,

"[Zachary's] choice not to file a separate petition and instead to attempt to embed a request into an unrelated pleading was likely influenced by his counsel's inability to comply with Supreme Court Rule 137 regarding; 'causes undue mental, physical, or emotional harm to the child.['] *** [Zachary] (and his counsel) had no facts to support the allegation yet the pleadings were signed and verified."

¶ 58 The Marriage Act is civil in nature and follows the provisions of civil practice law. *Id*. § 105(a)). As such, the substance of pleadings follows the Code of Civil Procedure. 735 ILCS 5/1-101 *et seq.* (West 2024). "All defects in pleadings, either in form or substance, not objected to in the trial court are waived." *Id.* § 2-612(c). Megan did not object to the amended dissolution petition at the circuit court level. She may not challenge its contents as to the substance of the pleading for the first time on appeal. As such, the issue of the substance of the petition is waived on appeal.

19

¶ 59    As to the pleading itself, the title of the document was "Amended Petition for Dissolution of Marriage," but the contents of the pleading also contained the petition for step-parent visitation. Illinois courts have held that "the character of the pleading should be determined from its content, not its label." *In re Haley D.*, 2011 IL 110886, ¶ 67. The language included in the amended dissolution petition followed the language of the Marriage Act and incorporated all the necessary factors for Zachary to have standing to file for visitation. As such, Zachary clearly filed a petition for step-parent visitation pursuant to the Marriage Act.

¶ 60                    2. *Circuit Court's Decision*

¶ 61    Megan argues that the circuit court erred in granting step-parent visitation to Zachary, that Zachary was granted "parenting time," and that the step-parent visitation statute is unconstitutional. We first must address the standard of review in non-parent visitation orders. Megan argues that as this is an issue of statutory construction, a *de novo* standard applies, citing *People v. Richardson*, 196 Ill. 2d 225 (2001). Megan provides no argument regarding statutory construction of the step-parent visitation statute, but instead provides general case law about parental decision making rights.[4] Zachary states that visitation orders will not be disturbed absent an abuse of discretion, citing *Kocal v. Holt*, 229 Ill. App. 3d 1023, 1027 (1992). While *Kocal* does state the cited standard, it is related to a prior statute involving parental visitation that has since been repealed and does not apply to step-parent visitation cases.

¶ 62    A circuit court's determination that a fit parent's decision regarding non-parent visitation is or is not harmful to the child's mental, physical, or emotional health will not be disturbed on

---

[4]Megan cites to *Wickham v. Byrne*, 199 Ill. 2d 309 (2002) throughout the case to attempt to argue that the step-parent visitation statute is unconstitutional. *Wickham* involves a prior version of the non-parent visitation statute that was then rewritten. The current version of the non-parent visitation statute has never been declared unconstitutional, and Megan does not set forth any argument as to how the statute could be unconstitutional.

20

review unless it is contrary to the manifest weight of the evidence. *Henkel*, 227 Ill. 2d at 181. In determining whether a judgment is contrary to the manifest weight of the evidence, the reviewing court views the evidence in the light most favorable to the appellee. *In re Marriage of Bates*, 212 Ill. 2d 489, 516 (2004). Where the evidence permits multiple reasonable inferences, the reviewing court will accept those that support the circuit court's order. *Id.* Accordingly, we will find that a circuit court's decision is against the manifest weight of the evidence only " 'where a review of the record clearly demonstrates that the result opposite to [the one] reached by the trial court was the proper result.' " *In re Anaya R.*, 2012 IL App (1st) 121101, ¶ 50 (quoting *In re Stephen K.*, 373 Ill. App. 3d 7, 25 (2007)); *Best v. Best*, 223 Ill. 2d 342, 350 (2006) (ruling that a finding is against the manifest weight of the evidence only if it is unreasonable, arbitrary and not based on the evidence presented). As such, we will apply a manifest weight of the evidence standard.

¶ 63    Section 602.9 of the Marriage Act permits specific non-parents to petition for visitation. 750 ILCS 5/602.9 (West 2024). The petition may be filed if there has been an unreasonable denial of visitation by a parent and the denial has caused the child mental, physical, or emotional harm. *Id.* § 602.9(b)(3). There is a rebuttable presumption that a fit parent's actions and decisions regarding visitation are not harmful, and the burden is on the filing party to prove that the parent's actions and decisions regarding visitation will cause undue harm to the child's mental, physical, or emotional health. *Id.* § 602.9(b)(4). Zachary filed his petition for step-parent visitation pursuant to section 602.9(c)(1)(E), which states that a step-parent may file for visitation if (i) the child is born to parents who are not married to each other; (ii) the parents are not living together; (iii) the petitioner is a step-parent; and (iv) the parent-child relationship has been legally established. *Id.* § 602.9(c)(1)(E).

21

¶ 64    The circuit court found that Zachary had standing to file the petition for step-parent visitation, stating, "The Court interprets section 602.9(c)(1)(E) as specific to individuals in [Zachary]'s position; *i.e.* a step-parent who is divorcing the child's parent." The circuit court next considered if Zachary proved that Megan made an unreasonable denial of visitation and that denial caused J.E. undue mental, physical, or emotional harm. The court found that the abrupt denial of visitation between Zachary and J.E. was unreasonable, stating that J.E. believed Zachary to be his father for his entire life until May 26, 2024, and that Zachary signed a voluntary acknowledgement of paternity and was held out to be J.E.'s father. For the first six months of the parties' separation, Zachary had equal time with J.E. until Megan stopped all contact between Zachary and J.E. on May 26, 2024. A temporary court order granted Zachary visitation with J.E., but Megan stopped following the court order on July 25, 2024. Zachary had not seen J.E. since that time. This decision "abruptly cut J.E. off from the only father he's ever known." The circuit court found this to be an unreasonable denial of visitation.

¶ 65    The circuit court next considered if this unreasonable denial of visitation caused J.E. undue mental, physical, or emotional harm. The court stated the following evidence presented at trial supported a reasonable inference of emotional and mental harm: (1) J.E. telling the GAL that he loves Zachary and wants to see him; (2) Megan's testimony that "it would not surprise her if J.E. told the GAL he wants to see [Zachary];" (3) the denial of visitation caused J.E. to have no father figure at all, as he has never met his biological father; (4) the letter J.E. wrote and took steps to hide from Megan so L.E. could deliver it to Zachary after seven months of no visits and after J.E. had knowledge that Zachary was not his biological father; and (5) J.E.'s enrollment in counseling after a denial of visitation with Zachary and Megan telling J.E. that Zachary was not his father. The circuit court found that Megan's actions caused J.E. mental and emotional harm. The evidence

22

presented at trial supports the circuit court's reasonable inference that the unreasonable denial of visitation caused J.E. undue harm. See *In re Marriage of Bates*, 212 Ill. 2d at 516.

¶ 66     Once a petitioner has proved that the unreasonable denial of visitation caused harm, the circuit court considers the factors listed in the Marriage Act to determine if visitation should be granted. These factors include (1) the wishes of the child; (2) the mental and physical health of the child; (3) the mental and physical health of the petitioner; (4) the length and quality of the prior relationship between the child and the petitioner; (5) the good faith of the petitioner; (6) the good faith of the respondent; (7) the quantity of the visitation time requested and the potential adverse impact that visitation would have on the child's customary activities; (8) any other fact that establishes the loss of the relationship between the petitioner and the child is likely to unduly harm the child's mental, physical, or emotional health; and (9) whether visitation can be structured in a way to minimize the child's exposure to conflict between the adults. 750 ILCS 5/602.9(b)(5) (West 2024). Further, for step-parents, the court should consider (1) whether the child resided with the petitioner for at least six consecutive months with or without a parent present; (2) whether the child had frequent and regular contact or visitation with petitioner for at least 12 consecutive months; and (3) whether the step-parent was a primary caretaker for the child for a period of not less than 6 consecutive months within the 24-month period immediately preceding the commencement of the proceeding. *Id.* § 602.9(c)(2).

¶ 67     The circuit court applied the facts presented at trial to every single factor listed above. The court found that every factor favored granting visitation to Zachary. The court specifically included that Zachary and J.E. formed a parent-child bond over 10 years and Zachary raised J.E. as his own child. Zachary stated that he would do anything he could to remain in J.E.'s life, including considering adoption proceedings if necessary. Further, J.E. hid a letter from Megan to tell Zachary

23

J.E. missed him, J.E. expressed to the GAL he wished to see Zachary, and the GAL recommended ample visitation between them. Based on these facts, the circuit court granted step-parent visitation to Zachary.

¶ 68    The circuit court addressed the parties' credibility, conducted research into non-parent visitation, carefully weighed all the factors presented during the hearing, and made an individualized finding granting step-parent visitation to Zachary. Based on our review of the record and the evidence presented, an opposite conclusion to that reached by the circuit court is not clearly apparent. Therefore, we will not substitute our judgment for that of the circuit court. The circuit court's granting of step-parent visitation was not against the manifest weight of the evidence.

¶ 69                                D. Alleged GAL Bias

¶ 70    Megan next argues that the GAL was biased against her and, as such, the circuit court's reliance upon his report was improper. Megan argues that because the GAL changed the recommendation included in his final report from his interim report, he exhibited a preference or bias for Zachary.

¶ 71    In child custody matters, "there is a strong and compelling presumption in favor of the result reached by the trial court because it is in a superior position to evaluate the evidence and determine the best interests of the child." *In re Marriage of Agers*, 2013 IL App (5th) 120375, ¶ 25. We will not overturn the circuit court's decision "unless the court abused its considerable discretion or its decision is against the manifest weight of the evidence." *Sadler v. Pulliam*, 2022 IL App (5th) 220213, ¶ 42. A decision is against the manifest weight of the evidence where the opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence. *Young v. Herman*, 2018 IL App (4th) 170001, ¶ 56. As a reviewing court, we may not reweigh the evidence, assess witness credibility, or set aside the circuit court's decision

24

simply because a different conclusion could have been drawn from the evidence. *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 51.

¶ 72    The circuit court made a direct credibility finding of the GAL after the trial. The finding was as follows:

> "The Court found the GAL's testimony at trial credible. Despite [Megan]'s arguments to the contrary, the GAL did not show any bias against either party and answered questions directly and honestly. The Court shares the GAL's credibility and demeanor concerns about [Megan]. The GAL [brought] facts to the Court's attention that the Court would not have otherwise known. The GAL served his role extremely well."

¶ 73    Megan's argument is essentially asking this court to reweigh the evidence and reassess witness credibility, which we will not do. The circuit court found the GAL to be credible and relied on his reports and testimony in its findings. We find that this decision was not against the manifest weight of the evidence.

¶ 74                                         E. Best Interests of L.E.

¶ 75    Section 602.7(b) of the Marriage Act requires circuit courts to evaluate 17 separate factors to determine the child's best interests with respect to the allocation of parenting time. 750 ILCS 5/602.7(b) (West 2024). The factors are (1) the wishes of the parent; (2) the wishes of the child; (3) the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of the petition; (4) any prior agreement or course of conduct between the parents; (5) the interaction and interrelationship of the child with his or her parents and siblings or any other significant person; (6) the child's adjustment to home, school, and community; (7) the mental and physical health of all involved; (8) the child's needs; (9) the distance between the parents' residences, the cost of transporting, the families' daily schedules,

25

and the ability of the parents to cooperate; (10) whether a restriction on parenting time is appropriate; (11) physical violence or threat of physical violence; (12) the willingness and ability of each parent to place the needs of the child ahead of his or her own needs; (13) the willingness of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child; (14) the occurrence of abuse against the child or other members of the household; (15) whether one of the parents is a convicted sex offender; (16) the terms of a parent's military family-care plan; and (17) any other factor that the court expressly finds to be relevant. *Id.*

¶ 76     In the present case, the circuit court evaluated all the factors and found that the following factors did not favor either parent: (1), (3), (7), and (9). The following factors did not apply to the case: (10), (11), (14), (15), and (16). The following factors favored Zachary: (2), (6), (8), (12), (13), and (17). The following factors favored Megan: (4) and (5).

¶ 77     Megan's brief does not clearly state which factors she believes the circuit court improperly considered in Zachary's favor when determining parenting time. Her argument instead focuses on where L.E. should attend school, the sibling relationship between L.E. and J.E., and the summer schedule.

¶ 78     The circuit court considered factor (5) in Megan's favor, which is the interaction and interrelationship of the child with his or her parents and siblings. The court stated, "One of the primary concerns of this Court is L.E.'s relationship with J.E. specifically because they are close in age, but the Court is also concerned, to a lesser extent, about L.E.'s relationship with A.U. The Court also believes it is important that [Zachary]'s mother maintains her relationship with L.E." The circuit court directly attributed this factor in Megan's favor, which takes into account Megan's arguments regarding where L.E. should attend school, and her relationship with J.E. The court also

26

addressed this issue in factor (8), the child's needs. The court acknowledged that Megan argued that L.E. should remain in the Mt. Olive school district, but stated, "[Megan]'s arguments as to L.E.'s needs fail to recognize that [Megan] is the sole reason L.E. changed schools in 2024." The circuit court fully considered these facts and Megan's argument about separating the siblings, and in fact found this to be in her favor. Megan is essentially asking this court to reweigh this factor more heavily in her favor, which we may not do. *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 51.

¶ 79    Megan argues that the circuit court erred in granting an every-other-week schedule between the parties during the summer months, "which will result in the child being with the paternal grandparents or a babysitter over 40 hours per week, two weeks each month." Megan states that she "worked out a schedule" that will allow her to be home all day and available to L.E. during the summer. The circuit court again acknowledged this argument in factor (8). The court stated,

> "[Megan] believes that by changing employment to allow herself to work nights while L.E. is at her home in the summer months, then she can prohibit [Zachary] from any additional summer parenting time because [Megan] will be available to parent L.E. during the day while [Zachary] is at work. [Megan]'s argument is wholly unpersuasive. The Court finds [Megan]'s testimony that she will not sleep after working a night shift is not credible. [Megan]'s rigid stance that [Zachary] is the only person allowed to be with L.E. while L.E. is at [Zachary]'s home is incredible given the fact that [Megan] testified she allows Kyle [her boyfriend] and Kyle's mother to watch L.E. while she is at work. [Megan] has consistently displayed a 'do as I say, not as I do' attitude towards [Zachary]'s parenting time."

The circuit court already considered this argument after the trial and did not find it to be credible.

27

¶ 80   Megan also argues that the summer parenting schedule will cause L.E. to be away from J.E. during the summer months for a week at a time, but the summer schedule actually permits *more* time between the siblings. During the school year, the siblings will spend time together during J.E.'s step-parent visitation, and when L.E. is with Megan. The summer schedule allows L.E. to spend every other week with J.E at Megan's house. As such, this argument is not persuasive

¶ 81   The circuit court acknowledged that separating J.E. and L.E. was not an "easy decision to make." The court said,

> "Separating siblings is disfavored by any court and this Court will generally not separate siblings; however, in this case the Court believes granting [Zachary] primary parenting time during the school year is in L.E.'s best interests. LE.'s relationship with J.E. is the Court's biggest concern about separating siblings in this case and the Court has spent considerable time considering this decision. *** The Court believes [Zachary]'s testimony that he will work with [Megan] to co-parent L.E. The Court does not believe [Megan]'s testimony that she would allow [Zachary] additional parenting time if he asked. [Megan] has shown a willingness to violate court orders, to manipulate the child, to attempt to manipulate the court system, and an overall pattern of attempting to minimize [Zachary]'s role in L.E.'s life."

¶ 82   The circuit court thoroughly considered the arguments made by Megan and did not find them persuasive. The court's order found that the evidence and testimony presented at the trial showed that Megan manipulated L.E. to attempt to persuade the GAL that L.E. did not wish to see Zachary, put her needs above L.E.'s, and that she was unwilling to facilitate and encourage any relationship between L.E. and Zachary, despite presenting no evidence that Zachary was a "bad parent."

28

¶ 83    The circuit court very clearly evaluated L.E.'s best interests, examining each factor individually and considering her overall well-being, including her relationships with Zachary and J.E. The circuit court awarded Zachary a majority of parenting time based on the facts it applied to each factor. This court will not reweigh the evidence or reassess witness credibility. Nothing in the record establishes that the circuit court gave undue weight to any factor in determining L.E.'s best interest. Accordingly, under the manifest weight of the evidence standard, we will not reverse the circuit court's findings. The circuit court's allocation of parenting time is supported by the record and does not result in a manifest injustice. Therefore, we affirm the circuit court's order awarding Zachary primary parenting time of L.E. and establishing the parties' parenting plan.

¶ 84                                    F. Admonishments

¶ 85    This court spent a considerable amount of time reviewing the record and the arguments of the parties to determine what issues were actually brought before the court on appeal. Rule 341(h) governs the contents of an appellant's brief. Ill. S. Ct. R. 341(h) (eff. Oct. 1, 2020). Subsection (h)(6) requires that a statement of facts be provided that contains the facts necessary to an understanding of the case with appropriate reference to the pages of the record on appeal. *Id.* Subsection (h)(7) requires the appellant's brief to include argument containing the contention of the appellant and the reasons therefore, with citation of the authorities and the pages of the record relied on and provides that points not argued are forfeited and shall not be raised in the reply brief, oral argument, or on petition for rehearing. *Id.* As previously stated, we are "entitled to have the issues clearly defined and supported by pertinent authority and cohesive arguments; [we are] not merely a repository into which an appellant may 'dump the burden of argument and research,' nor is it the obligation of this court to act as an advocate or seek error in the record." *U.S. Bank v.*

*Lindsey*, 397 Ill. App. 3d 437, 459 (2009) (quoting *Obert v. Saville*, 253 Ill. App. 3d 677, 682 (1993), and citing Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008)).

¶ 86    "The rules of procedure concerning appellate briefs are rules and not mere suggestions." *Niewold v. Fry*, 306 Ill. App. 3d 735, 737 (1999). Failure to comply with the rules for appellate briefs is not an inconsequential matter. *Burmac Metal Finishing Co. v. West Bend Mutual Insurance Co.*, 356 Ill. App. 3d 471, 478 (2005). The purpose of the rules is to require parties before a reviewing court to present clear and orderly arguments so that the court can properly ascertain and dispose of the issues involved. *Zadrozny v. City Colleges of Chicago*, 220 Ill. App. 3d 290, 292 (1991).

¶ 87    Megan's brief violates several provisions of Rule 341, and it is not a model of clarity. Within the statement of facts, it includes several misstatements of the record, there is an insufficient number of citations to the record on appeal to support the facts, and it is missing pertinent information to the issues on appeal that are necessary to understand the case. Counsel did not even include the filing date of, or citation to, the parenting plan of which she appealed.

¶ 88    This court spent the most time attempting to discern the issues raised in Megan's argument section. Counsel failed to sufficiently develop her argument about Megan's constitutional rights, included argument about parenting time of L.E. under a section regarding J.E., and continually argued that Zachary never filed a petition for step-parent visitation, despite the fact that Zachary included the statutory language within his pleading and Megan offered no case law or support that a separate document needed to be filed. Counsel's brief also contains numerous typographical errors, formatting issues, and grammatical errors. Overall, counsel's brief was unclear and caused this court undue labor in order to discern her arguments on appeal.

¶ 89    We additionally note that this is not the first time that counsel has filed a brief in a court of review that failed to comply with supreme court rules. In *Delgado, et al. v. Rockford Memorial Hospital, et al.*, 2025 IL App (4th) 240804-U, ¶ 7-10, the Fourth District found that the additional facts included within counsel's appellee brief "contain[ed] unsupported and misrepresented allegations of fact" and that the court would not consider the statement of facts not supported by the record. In *Ashcraft, et al. v. Rockford Memorial Hospital, et al.*, 2021 IL App (2d) 190860-U, ¶ 27, the Second District found that counsel forfeited an issue on appeal due to failure to comply with Rule 341.

¶ 90    We admonish counsel to comply with the supreme court rules in any future filings with this court. Failure to do so could result in forfeiture of issues or dismissal of a brief entirely at the court's discretion.

¶ 91                              III. CONCLUSION

¶ 92    Based upon the reasons stated, we affirm the circuit court's parenting plan and step-parent visitation order.

¶ 93    Affirmed.